Burnice Howard DUNN and Martha Lee Brown DUNN, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17919.

United States Court of Appeals Fifth Circuit.

Jan. 11, 1960.

Rehearing Denied Feb. 18, 1960.

William T. Brooks, Atlanta, Ga., for appellants.

William C. O'Kelley, Asst. U. S. Atty., Charles D. Read, Jr., U. S. Atty., Atlanta, Ga., for appellee.

Before RIVES, Chief Judge, and TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal by husband and wife, sentenced to ten and five years respectively on jury verdicts of guilty on four separate charges, one for bank robbery, 18 U.S.C.A. § 2113(a), three for the crime of putting life in jeopardy, 18 U. S.C.A. § 2113(d). The primary defenses at the trial were claimed alibis and mistaken identity.

The only serious contention on appeal is that the trial court erred in receiving evidence of identification from several witnesses who had viewed the defendants for purposes of identification while they were held under conditions asserted by them to amount to an illegal arrest.

The essential facts of the case can be stated as follows: On Saturday, February 21, 1959, at approximately one o'clock in the afternoon, a man with bandages on his face entered the Peoples National Bank of Lithonia, Georgia, and pointed a pistol at the Cashier, the bookkeeper and a depositor. The robber thrust a brown paper sack at the Cashier and ordered him to fill it with money. The sack was returned to the robber with $6,800.00 of the bank's money which was insured with the Federal Deposit Insurance Corporation. With a threat that he would kill all those present if they reported him the robber ran out of the bank and got into a green and white Chevrolet automobile being driven by a woman. That Saturday night at approximately eight o'clock, F.B.I. agents placed the residential area of Norris Lake, which was seven miles out of Lithonia and the residence of the appellants, under surveillance to locate a "Pete" Dunn. The appellant, Burnice Howard Dunn, it later developed, was also known as "Pete" Dunn. At about 2:40 A.M. that morning, Sunday, the appellants drove up to the gatehouse at the lake in their 1941 Dodge. The agents identified themselves and told the appellants that they wished to question them concerning their whereabouts on Saturday inasmuch as they were investigating "an incident" which occurred in Lithonia on that day. The appellants got out of their car and went into the clubhouse with three or four of the agents. The agents testified that the appellants were not under arrest and that they merely asked the appellants to go into Lithonia with them and that at no time were the appellants forced to do anything. Special agent Davis testified that the appellants were free to leave at any time they wanted to leave. Special agent Kassinger testified that they

were not being detained at this time and that if he was arresting a person for bank robbery that he would handcuff him. The appellant, Burnice Howard Dunn, testified that he refused to answer the questions put to him about his activities because of the agents mannerisms and offensive approach. He further testified that his person was searched and the glove compartment of his car was opened. However, according to appellant's own testimony, he made no objection and even told the agent how to open the latch on the glove compartment door. The appellant further testified that he told agent Davis either to arrest him or let him go home and go to sleep, whereupon Davis said, "Well, you are under arrest."

In rebuttal to this testimony the prosecution put agent Davis back on the stand and he testified as follows:

"Q. Did you at any time tell the defendant Dunn that he was under arrest? A. No sir. I did not.

"Q. Were you present during the entire time that you were at the clubhouse? A. At the clubhouse, yes sir, and he made [sic] that question. He asked me, he said, 'are we under arrest?' And I told him, 'no, you are not under arrest.' "

After approximately fifteen minutes at the clubhouse the agents took the appellant to Lithonia. There they were placed in separate rooms where Burnice Howard Dunn was later identified as the bank robber by the Cashier, the depositor and the Mayor, Mr. Elliott, who had been called to the City Hall by the agents. A Mr. McGhee was also present but he did not testify at the trial.

Upon being so identified the appellants were placed under arrest at approximately 5:00 A.M. and arrangements made to take them immediately before a Commissioner in Atlanta, Georgia.

On the trial the government introduced evidence by the Cashier, the bookkeeper and the depositor to prove the occurrences in the bank outlined above. All three of these witnesses identified the appellant, Burnice Howard Dunn, in court as the man who came into the bank. These witnesses did not on direct examination testify to any extra-judicial identification. The appellants' attorney, out of the presence of the jury, moved to strike the identification by the Cashier because of the prior identification in the Lithonia City Hall, which counsel contended was made while the appellants were under illegal arrest. The trial judge pointed out that there was no evidence of an arrest in the record and that the movant was the only one who had brought out the fact about the prior identification at the City Hall, and stated that if such identification was sought to be introduced he would entertain counsel's motion to suppress. Several times in cross examination the appellants' counsel referred to the identifications at the City Hall and caused prosecution witnesses to state that they had identified Dunn there, but the prosecution brought out nothing about the incident. The Mayor of Lithonia, Mr. Coy Elliott and his brother-in-law, Mr. Pratt, testified that at the time of the robbery they stopped in a car next to the bank robbery car which was blocking traffic. These witnesses positively identified the appellant, Martha Lee Dunn, in court as the driver of the car. They testified that while they were sitting there a man with bandages on his face ran from the direction of the bank and jumped into the car and it sped off. Mr. Albert Usher, a resident of Lithonia, testified that he was on the street and saw a man with a sack on his hand and bandages on his face run from the bank to the car. Mr. Usher identified both appellants in court as the persons he saw. The government introduced two other witnesses who saw appellants in the green and white Chevrolet in Lithonia just prior to the time of the bank robbery and identified them in court. One of the witnesses identified both appellants and the other stated that appellant, Burnice Howard Dunn, resembled the man. Another government witness, Whitt Eberhardt, testified that he saw the Chevrolet with the appellants in it about two hours before the

robbery and he identified them in court as the persons he saw. A fifteen-year-old boy, James Burroughs, testified that on the day of the robbery he saw the Chevrolet and an old car on a country road together with two people in it. He identified the appellant, Martha Lee Brown Dunn, as the woman in the old car. Several witnesses testified that they saw the appellants depart from and return to Norris Lake several times on the day of the robbery and that one of these occasions was around one o'clock in the day. A gun which the Cashier testified as resembling the gun used in the robbery was found in a search of appellants' home under authority of a search warrant. None of the stolen money was ever found. In an attempt to prove the motive of the robbery, the prosecution proved the husband was unemployed and gambled for a living and that the wife had been working briefly as a waitress but was on a leave of absence because of sickness.

After a careful study of the record we have reached the conclusion that there was overwhelming support for the jury's finding on the identity of the bank robbers. The only weakness suggested is that their identity was not first established by having the government witnesses pick them out from a line-up. This, of course, goes merely to the weight which the jury is to give to the testimony of the identifying witnesses. The only question is whether any of this evidence should have been suppressed.

The theory on which appellants claim some of the identification testimony should have been suppressed is that they were forced to give evidence against themselves by being illegally detained for the purpose of being viewed by future identification witnesses. Appellants contend this violates the requirements of compliance with Rule 5(a) F.R.Crim.P., 18 U.S.C.A., as construed by the Supreme Court in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479. The principle invoked is that stated in the last sentence of the Mallory opinion:

"It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.'"

It is plain from the undisputed testimony that it was not until Dunn and his wife had been viewed by several witnesses to the robbery that the government had sufficient basis for arresting them. It necessarily follows, therefore, that the government obtained what it considered probable cause for an arrest only out of events that transpired while the accused persons were present at the City Hall. If their presence there was voluntary then of course appellants cannot complain of what transpired. Thus two questions are presented: (1) Was this viewing done while the appellants were illegally detained; and (2) If so, did this render inadmissible the evidence of identification later given by these witnesses that, on its face, was not connected with the allegedly illegal viewing.

We conclude that on the record the first issue is not adequately raised. We, therefore, need not proceed to consideration of the second.

It is difficult to discover the exact ruling of the trial court which appellants claim was prejudicially erroneous. When the bank Cashier, Starr, completed his testimony on direct examination, during which he said he recognized Dunn in the court room as the man who had robbed him at gunpoint, appellants' counsel asked him sufficient questions on cross examination to get answers to the effect that he was at the City Hall early on Sunday morning. Thereupon, appellants' counsel moved to strike Starr's testimony on the ground that he had identified Dunn at the City Hall while he was being illegally detained. Counsel also stated that he wanted to move to keep out similar testimony expected to be offered by three others who saw Dunn at the City Hall. To this motion the court said:

"The Court: That is correct, but nobody asked him anything about the Police Station or going to the Police Station except you. You are the one who has raised that. He hasn't testified yet that he identified him at the Police Station. He just stated who all was up there and he stated this man was there and the others named were there, but he has not testified that he identified him at that time and place. There is no evidence in this record up to now as to whether the man was under arrest or not or if he was under arrest, whether there was any warrant for him or not, if so, what the circumstances were, none of that is in the record now.

    \*    \*    \*    \*    \*    \*

"He hasn't testified that he identified him there, Mr. Brooks. The only testimony that this man up to now has testified about was his recollection of seeing this man at the window and saying that the man seated at the table was that man. Now, there has been no testimony to the effect that he identified him in any lineup at the Police Station or elsewhere. Now, if it is developed that there is such identification, I will certainly entertain your motion, but he has not so testified  \*  \*  \*"

The government thereafter proceeded with its proof by offering all the other witnesses who merely testified on direct that they identified the accused parties. On cross examination of several of them, including Starr, counsel did bring out the fact that they had first identified Dunn when they saw him at the City Hall. Appellants then took the stand themselves, and for the first time affirmative evidence was offered by Dunn (not corroborated by his wife) to the effect that one of the officers told him he was under arrest before he was taken to the City Hall. On rebuttal the government witnesses were recalled and each of them denied Dunn's testimony. Thus, for the first time can it be said the issue was then drawn as to whether Dunn's presence at the City Hall was voluntary. The situation then arose which the trial court had previously stated would warrant his consideration of a motion by appellants' counsel. The court said, "If it is developed that there is such identification, I will certainly entertain your motion." No motion was made either that the identification be stricken or that the jury be charged that they should not consider the identification testimony if they found that the witnesses had first recognized Dunn while he was being illegally detained. Thus, no ruling was called for or made by the trial court which can be passed upon as to this issue. For all that appears in the record, appellants abandoned the contention by not accepting the court's invitation to raise the issue for decision after testimony made it possible for the court to make a ruling. Appellants were content to permit the case to go to the jury without a request that the court charge on the matters arising out of the alleged illegal detention.

Finding no other error we must affirm the judgment of the trial court.

Affirmed.